**TELECOMMUNICATIONS RESEARCH AND ACTION CENTER; Washington Area Citizens Coalition Interested in Viewers' Constitutional Rights, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Public Broadcasting Service, et al., Intervenors.**

**Nos. 92–1358, 92–1519.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 6, 1994.

Decided June 24, 1994.

Gigi B. Sohn, Washington, DC, argued the cause, for petitioners. With her on the briefs was Andrew Jay Schwartzman, Washington, DC.

James M. Carr, Counsel, F.C.C., Washington, DC, argued the cause, for respondents. With him on the brief were Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Anne K. Bingaman, Asst. Atty. Gen., and Cather-

ine G. O'Sullivan and Marion L. Jetton, Attys., U.S. Dept. of Justice, Washington, DC. C. Grey Pash, Jr., Atty., F.C.C., Washington, DC, entered an appearance.

Arthur B. Goodkind, Washington, DC, entered an appearance for intervenors Public Broadcasting Service, et al. in 92–1358.

Jerry V. Haines and Richard E. Wiley, Washington, DC, entered appearances for intervenor Oliver Productions, Inc. in 92–1519.

Before WALD, EDWARDS, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Petitioners, Telecommunications Research and Action Center and Washington Area Citizens Coalition Interested in Viewers' Constitutional Rights (collectively, "TRAC"), seek review of two orders of the Federal Communications Commission ("FCC" or "Commission") granting exemptions to the "equal time" requirements of the Communications Act of 1934. In the first order, the Commission denied TRAC's request that the Commission vacate its decision in *Oliver Productions, Inc.,* 4 F.C.C.R. 5953 (1989) ("*Oliver*"), which held that certain portions of the television show *The McLaughlin Group* are "bona fide newscasts." *See Telecommunications Research and Action Center,* 7 F.C.C.R. 6039 (1992) (the "*McLaughlin Group Decision*"). In the second order, the Commission declared that news interview programs produced by entities that are not Commission licensees can qualify as "bona fide news interviews," which are also exempt from the equal time requirements. *See Independent Producers Decision,* 7 F.C.C.R. 4681 (1992). We defer to the Commission's reasonable interpretation of the Act and deny the petitions for review.

## I. BACKGROUND

Section 315 of the Communications Act of 1934, commonly known as the "equal time" or "equal opportunity" provision, requires that when a broadcast licensee permits a "legally qualified candidate for any public office to use a broadcasting station," he must provide all other legally qualified candidates for that office with an equal opportunity to use the broadcast station. 47 U.S.C. § 315(a) (1988). However, the Act exempts four categories of broadcast material from the equal time requirement by providing that an

> [a]ppearance by a legally qualified candidate on any—
>
> (1) bona fide newscast,
>
> (2) bona fide news interview,
>
> (3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or
>
> (4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),
>
> shall not be deemed to be use of a broadcasting station within the meaning of this subsection.

*Id.* § 315(a)(1)–(4). TRAC protests the FCC's application of these exemptions in two separate orders that we discuss below.

### A. *The McLaughlin Group Decision*

In the fall of 1988, the producer of *The McLaughlin Group,* Oliver Productions, Inc., petitioned the FCC for a ruling declaring that the news reporting segments of *McLaughlin* are "bona fide newscasts" exempt from the equal time provisions of the Act. In an order dated November 4, 1988, the FCC's Mass Media Bureau granted Oliver's petition. *See Oliver Productions, Inc.,* 3 F.C.C.R. 6642 (Mass Med.Bur.1988).

TRAC petitioned the full Commission for review of the Bureau's order. TRAC first argued that any candidate appearances on *McLaughlin* are so short as to come within the Commission's "fleeting use" exception to section 315, making the Bureau's ruling unnecessary. Alternatively, TRAC argued that *McLaughlin*'s news segments should *not* be exempted as "bona fide newscasts" because the show is not produced by an FCC licensee or network, and, in TRAC's opinion, is not presented in a typical newscast format.

The Commission denied TRAC's petition for review. *See Oliver,* 4 F.C.C.R. 5953. The Commission first ruled that some *McLaughlin Group* news segments were too long to qualify as "fleeting uses." *Id.* at 5954. The Commission then rejected TRAC's contention that *McLaughlin* 's failure to conform to TRAC's vision of a typical newscast rendered it ineligible for the "bona fide newscast" exemption. The Commission instead determined that a program could qualify for the exemption if it reported about "some area of current events, in a manner similar to more traditional newscasts." *Id.* The Commission then found that the news reporting segments of *McLaughlin* were sufficiently similar to traditional newscasts to qualify for the exemption because they report current national and international news using videotaped features that have previously aired on network newscasts. *Id.* at 5955. The Commission also determined that *McLaughlin* met the "bona fide" requirement because the Commission had no evidence before it suggesting that its news segments "are selected for reasons other than their genuine news value or are designed to advance or harm any particular candidacy." *Id.* at 5954. The Commission finally rejected TRAC's argument that the "bona fide newscast" exemption of section 315 could properly apply only to programs produced and controlled by an FCC licensee or network. *Id.*

TRAC then petitioned this Court for review of the FCC's decision. We rejected TRAC's petition on the ground that TRAC lacked standing to challenge the FCC's ruling. *Telecommunications Research and Action Center v. FCC,* 917 F.2d 585, 587–88 (D.C.Cir.1990) ("*TRAC I* "). We explained that TRAC could not claim constitutional injury from the Commission's ruling that *McLaughlin* 's news segments were exempt as "bona fide newscasts" because one of TRAC's arguments before the Commission was that those segments *were* exempt, although TRAC would have employed the "fleeting use" doctrine to reach that result. We held that TRAC's disagreement "with the rationale employed by the FCC to reach a result [TRAC] endorsed below does not constitute injury cognizable for standing purposes." *Id.* at 588. However, we added that "should *McLaughlin* 's program format subsequently change, [TRAC] likely would have viewer standing to raise a properly framed challenge to the continued applicability of the bona fide newscast exemption." *Id.*

Shortly before we decided *TRAC I,* TRAC instituted a new proceeding with the FCC asking the Commission for a declaratory ruling vacating its *Oliver* decision and reversing its position on *McLaughlin* 's status as a "bona fide newscast." In that proceeding, TRAC alleged that it had recently viewed news reporting segments of *McLaughlin* in which "candidates for public office ha[d] appeared for more extensive periods of time than the earlier record had led TRAC to believe" and that these segments would not qualify for the "fleeting use" exemption it had relied upon in its prior petition. Because TRAC claimed that these facts constituted a different factual premise from the record previously before the Commission, TRAC urged the Commission to vacate its earlier ruling that the news reporting segments of *McLaughlin* are exempt from the equal time provisions as "bona fide newscasts." The Commission denied this request for a declaratory ruling. *See McLaughlin Group Decision,* 7 F.C.C.R. 6039. TRAC now seeks our review.

B. *The Independent Producers Decision*

On January 9, 1992, a group of public broadcasters requested a declaratory ruling from the FCC that "independently produced, bona fide news interview programs" are exempt from the equal time provision of section 315(a). Although the Commission had previously held that the "bona fide news interview" exemption could come into play only when such programs were produced by FCC licensees or networks, the public broadcasters urged the Commission to overrule that interpretation of section 315. The public broadcasters first argued that the plain language of section 315 does not restrict eligibility for the news interview exemption to any particular kind of entity. In addition, the public broadcasters argued that the Act's legislative history showed that the intent of Congress was to grant an exemption from the equal opportunity requirements for any

news interview program "widely distributed to stations by sources unassociated with any candidate" without regard to whether the producer of the program was an FCC licensee.

TRAC opposed the public broadcasters' petition. TRAC argued that section 315 "is clear on its face that the exemptions are limited to a specific entity, *i.e.*, licensees." In addition, TRAC argued that the legislative history unambiguously expressed Congress's desire only to exempt programming controlled by an entity which was somehow accountable to the Commission.

The Commission granted the public broadcasters' petition. *See Independent Producers Decision,* 7 F.C.C.R. 4681. In so doing, the Commission reversed several prior decisions holding that a news interview must be produced or at least co-produced by an FCC licensee or network before it can qualify as an exempt "bona fide news interview." *See, e.g., Tennessee Educ. Ass'n,* 48 F.C.C.2d 438 (Complaints & Compliance Div.1974); *Evening Star Broadcasting Co.,* 63 F.C.C.2d 396 (Complaints & Compliance Div.1976). Explaining its decision, the Commission noted that the plain language of the "exemption speaks to any *bona fide* news interview program and contains no reference to a requirement that only programs produced by particular entities can fall within the exemption." 7 F.C.C.R. at 4682. Turning to the legislative history of the section 315 exemptions, the Commission noted that it had previously interpreted the Conference Report as evincing Congress's intent that the news interview exemption be limited "to programs in which the format, content and participants are determined by licensees and networks." *Id.* at 4683. However, "upon further reflection," the Commission "conclude[d] that the Report language was intended only to ensure that, in order for the exemption to apply, candidates themselves could not control the program's production details." *Id.* The Commission concluded that the Conference Report "appears to have stated that licensees and networks must perform those programming functions simply to distinguish them from candidates." *Id.*

TRAC now asks us to set aside both the *McLaughlin Group Decision* and the *Independent Producers Decision* on the ground that the FCC's construction of section 315 contradicts the statute's plain language, or alternatively, on the ground that the FCC's construction of that section is unreasonable.

## II. DISCUSSION

### A. *Standard of Review*

TRAC's petition for review rests upon its contention that the Commission misconstrued the "bona fide newscast" and "bona fide news interview" exemptions contained in section 315 of the Communications Act. We evaluate TRAC's arguments using the two-step framework set forth in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Under *Chevron,* we ask

> whether Congress has directly spoken to the precise question at issue. If we can come to the unmistakable conclusion that Congress had an intention on the precise question at issue our inquiry ends there.... However, if the statute before us is silent or ambiguous with respect to the specific issue before us, we proceed to the second step. At this stage, we defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose.

*Nuclear Info. Resource Serv. v. Nuclear Regulatory Comm'n,* 969 F.2d 1169, 1173 (D.C.Cir.1992) (en banc) (internal quotations and citations omitted).

### B. *Issue One: The FCC's determination that the news reporting segments of McLaughlin are "bona fide newscasts"*

In the first order under review in this case, the Commission denied TRAC's request for an expedited declaratory ruling vacating the Commission's original decision in *Oliver,* which held that the news reporting segments of McLaughlin are "bona fide newscasts" exempt from the equal opportunity requirements of section 315. *See McLaughlin Group Decision,* 7 F.C.C.R. at 6039. TRAC

argues that this ruling runs afoul of the plain language and legislative history of the Act.

TRAC first contends that the plain language of the phrase "bona fide newscast" forecloses the Commission's application of the term to *McLaughlin.* The parties agree that a typical *McLaughlin* program consists of several distinct "news reporting segments." In each of these segments, the moderator, John McLaughlin, reads a current news story that is accompanied by a videotaped clip of the events. These video clips are generally supplied by PBS, CNN, or one of the commercial broadcasting networks. After each news segment, a panel of four journalists discusses and debates the issues presented in the story. TRAC argues that *McLaughlin* 's news reporting segments cannot qualify as "newscasts" within the plain meaning of section 315 mainly because they do not present several uninterrupted stories in a row, as do typical network newscasts. The Commission responds that the statutory term "newscast" simply does not speak to issues of program formatting.

The answer is: Congress's choice of the word "newscast" is not sufficiently precise to compel the multi-story program format TRAC suggests. *Webster's* defines a "newscast" simply as "a radio or television broadcast of news." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1524 (1961). The Communications Act does not define the term at all. And nothing else in the Act suggests that a news segment must present several stories in a row in order to qualify for the "bona fide newscast" exemption. In fact, we have previously recognized that in drafting the exemptions to section 315, Congress explicitly chose "*not* to legislate in detail," and "opted for exemptions based on general categories relating to news coverage, rather than on specific program formats." *Chisolm v. FCC,* 538 F.2d 349, 357 & n. 17 (D.C.Cir.) (emphasis added), *cert. denied,* 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976). Congress thus left the Commission to define the precise contours of the "bona fide newscast" exemption and decide what, if any, format characteristics are necessary to come within the exemption's coverage.

Exercising this delegated authority, the Commission concluded that a news segment could qualify for the "bona fide newscast" exemption as long as it "reports about some area of current events in a manner *similar* [not necessarily identical] to more traditional newscasts." 4 F.C.C.R. at 5954 (emphasis added). The Commission then determined that the news reporting segments of *McLaughlin* fit this definition because "[d]uring those segments, McLaughlin reports on current national and world news using the methods typical of traditional newscasts." *Oliver,* 4 F.C.C.R. at 5955. In particular, the Commission noted that "[t]he video taped features accompanying these reports, which may contain appearances by candidates, are supplied by PBS, CNN and the commercial broadcasting networks" and "often have aired on the newscasts of the originating networks." *Id.* Given the statute's silence regarding the required program format of exempt newscasts, we defer to the Commission's reasonable interpretation of the "newscast" exemption.

TRAC next contends that the statute's use of the adjective "bona fide" to modify "newscast" plainly excludes the news reporting segments of *McLaughlin.* TRAC argues that in order to qualify as "bona fide", a program's news segments must be selected for the journalistic purpose of informing viewers about current events.[1] Indeed, both the Commission and this Court have previously embraced a similar definition of "bona fide" as applied to the section 315 exemptions. *See Henry Geller,* 95 F.C.C.2d 1236, 1243 ¶ 17 (1983) ("the term 'bona fide' ... was intended to emphasize Congress's intent that the programs be of genuine news value and not be used to advance the candidacy of a particular individual"); *Office of Communication of United Church of Christ v. FCC,* 590 F.2d 1062, 1065 (D.C.Cir.1978) ("By mod-

1. Petitioners also suggest that the news reporting segments of *McLaughlin* cannot qualify as "bona fide" newscasts because *McLaughlin* is produced by an independent producer rather than a Commission licensee or network. We discuss, and reject, petitioners' construction of the modifier "bona fide" in conjunction with our discussion of the *Independent Producers Decision. See infra* at 191–93.

ifying all four [exempt] categories with the phrase 'bona fide,' Congress plainly emphasized its reliance on newsworthiness as the basis for an exemption."). But the fact that the modifier "bona fide" may add a newsworthiness requirement to the "newscast" exemption does not mean that the news reporting segments of *McLaughlin* are non-exempt. The Commission's *Oliver* decision specifically found that "[r]egarding the 'bona fide' requirement, there is no information before the Commission to indicate that the 'news reporting segments' are selected for reasons other than their genuine news value or are designed to advance or harm any particular candidacy." *Oliver,* 4 F.C.C.R. at 5954. On appeal, TRAC has come forward with nothing that would cause us to disturb this Commission finding. We therefore decline to do so.

TRAC finally charges that *McLaughlin* cannot qualify for an equal time exemption because the legislative history of the Act indicates that Congress considered, but refused to create, an exemption for "panel discussions." *See Oliver,* 4 F.C.C.R. at 5955 (discussing legislative history relating to proposed panel discussion exemption). Be that as it may, this argument gets TRAC nowhere because the Commission did not exempt *McLaughlin*'s panel discussion segments from the equal time requirement.[2] The Commission exempted only the news reporting segments, and, as the Commission correctly determined, there is "no suggestion in the legislative history ... that ... Congress also intended to render non-exempt news segments of hybrid programs that also include panel discussion segments." *Id.* Having failed to point us to anything in either the language, history, or policies behind the "bona fide newscast" exemption that would lead us to disturb the Commission's judgment that the news reporting segments of *McLaughlin* were properly exempt, we deny TRAC's petition for review of the *McLaughlin Group* decision.

### C. *Issue Two: The FCC's conclusion that independently produced programs can qualify for equal time exemptions*

In the second order under review in this case, the *Independent Producers Decision,* 7 F.C.C.R. 4681 (1992), the Commission issued a declaratory ruling that "independently produced, bona fide news interview programs" are exempt from the equal opportunity provisions of section 315(a). This ruling followed on the heels of the Commission's *Oliver* decision, which held that programs qualifying for the "bona fide newscast" exemption could also be produced by independent producers. *See Oliver,* 4 F.C.C.R. at 5955. TRAC again argues that these rulings conflict with the language, history, and purpose of section 315. TRAC first contends that the plain language of section 315 unambiguously announces that only those programs produced by FCC licensees can qualify as "bona fide" news programs. TRAC's "plain language" argument centers on the fact that section 315's equal opportunity obligations are imposed exclusively on "licensees." *See* 47 U.S.C. § 315(a) (emphasis added) (equal opportunity obligations arise when a "*licensee* shall permit ... a legally qualified candidate for any public office to use a broadcasting station"). Because only licensees bear the responsibility of providing equal time to opposing candidates, TRAC contends that only programs *produced by* licensees can be exempt from these responsibilities. TRAC argues that to hold otherwise would "fly in the face of the plain language of Section 315(a)," because it would allow independent producers, as opposed to licensees, to "permit" candidates to use broadcast stations.

One does not have to wrestle long with the statutory language to realize that TRAC cannot possibly win the argument that its interpretation of section 315 is compelled by the plain language of the statute. As the Commission rightly noted, the exemptions themselves "contain[ ] no reference to a requirement that only programs produced by particular entities can fall within the exemption[s]." *Independent Producers Decision,* 7 F.C.C.R.

2. TRAC does not dispute the Commission's authority to exempt certain segments of an otherwise non-exempt program under section 315.

at 4682. Furthermore, although TRAC is correct to note that the Act subjects only FCC licensees to equal time obligations, it simply does not follow that only those shows produced by the licensees themselves can qualify as exempt programming. A broadcast licensee incurs equal time obligations *whenever* he permits a candidate to "use a broadcast station," regardless of who produced the show containing the candidate appearance. *See* 47 U.S.C. § 315(a). Similarly, then, a licensee will not incur equal time obligations whenever he airs a show that fits within one of the four categories of programming that are "not deemed to be use of a broadcasting station," *id.*, regardless of who produced the program. In other words, the plain language of section 315 concerns itself only with the responsibilities of licensees who broadcast exempt or non-exempt programming. It simply does not speak to the identity of the program's producer.

TRAC next contends that the Commission adopted an unreasonable interpretation of the statute by holding that shows produced by non-licensees can qualify as "bona fide." TRAC's argument on this point is grounded primarily on the legislative history of the Act, which TRAC maintains expresses the clear intent of Congress that exempt programming remain subject to licensee or network control. We are unpersuaded by petitioners' argument with respect to the legislative history of the "bona fide newscast" exemption. The House and Senate Reports are inconsistent with respect to whether licensee or network control is required in order to qualify as a "bona fide newscast," and the Conference Report is totally silent on this point.

TRAC's historical argument with respect to the "bona fide news interview" exemption stands on firmer ground, but ultimately it too collapses. The Conference Report accompanying the section 315 exemptions expressly refers to "bona fide news interviews," stating that

> in order for a news interview to be considered "bona fide" the content and format thereof, and the participants, must be determined by the licensee in the case of a news interview originating with the licensee of a station and by the network in the case of a news interview originating with a network; and the determination must have been made by the station or network, as the case may be, in the exercise of its "bona fide" news judgment and not for the political advantage of the candidate for public office.

H.R.Conf.Rep. No. 1069, 86th Cong., 1st Sess. at 4 (1959), *reprinted in* 1959 U.S.C.C.A.N. 2564, 2582. TRAC reads this report as expressing Congress's intent that only news interviews produced by Commission licensees and networks, who are subject to the FCC's jurisdiction, should be eligible for a section 315 exemption. According to TRAC, this restriction on who may produce exempt news programming is essential to the proper oversight and enforcement of the equal time regulations.

The Commission itself had previously read the Conference Report in the same manner as TRAC and had held that only licensees or networks could qualify for the "bona fide news interview" exemption. *See, e.g., Tennessee Educ. Ass'n,* 48 F.C.C.2d 438 (Complaints & Compliance Div.1974); *Evening Star Broadcasting Co.,* 63 F.C.C.2d 396 (Complaints & Compliance Div.1976). However, in ruling on the public broadcasters' petition, the Commission reversed its course. The Commission explained that its re-reading of the Act's legislative history, its knowledge of the changed conditions of the broadcast and cable industries, and its duty to further the goals of the Communications Act led it to believe that news interviews produced by independent producers could indeed qualify for the news interview exemption.

The Commission's order first noted that the Conference Report specifically refers to licensees and networks as the producers of "bona fide news interviews," and acknowledged that this language might reasonably be read as indicating Congress's desire that only these two entities should be allowed to control the content and format of exempt news interview programming. *Independent Producers Decision,* 7 F.C.C.R. at 4683. Indeed, the Commission had long read the Conference Report in precisely this manner.

However, upon re-examining the Report, the Commission determined that Congress's intent may not have been specifically linked to licensees or networks at all. Noting that in 1959, when the Conference Report was written, licensees and networks comprised almost the entire news programming universe, the Commission determined that the Report had apparently referred to these two entities merely to make clear that the candidates themselves could not produce or control exempt news interview programming. *Id.*

The Commission then examined the underlying purpose of the exemptions to the equal time provisions and determined that Congress's primary purpose in enacting these provisions was to ensure complete news coverage of political campaigns. *Id.* at 4684. *See also Kennedy for President Comm.*, 636 F.2d 417, 424 (D.C.Cir.1980) (exemptions added, in part, to "encourag[e] maximum coverage of all news events ... in order to cultivate a fully informed public"); *Chisolm*, 538 F.2d at 356 ("basic purpose" of exemptions is to "enable what probably has become the most important medium of political information to give the news concerning political races to the greatest possible number of citizens, and to make it possible to cover the political news to the fullest degree") (internal quotations omitted). The Commission also determined that its past refusal to extend the news interview exemption to independent productions had frustrated this congressional intent in that it had deterred the production of news interviews with political candidates. *Independent Producers Decision*, 7 F.C.C.R. at 4684. Thus, finding no conclusive evidence in the statute's language or legislative history that Congress intended to preclude independent production of exempt programming, the Commission opted for the course that, in its judgment would eliminate the "chilling effect" of its prior decisions and advance "the overriding congressional objective that prompted the exemptions: Congress's desire to ensure the free flow of news information regarding political candidates." *Id.*

We believe that the Commission's extension of the "bona fide" news programming exemptions to independent producers was reasonable and consistent with the language, legislative history, and policies of the Communications Act. As stated previously, the text of the Act simply does not speak to whether independently produced programming may qualify for equal time exemptions. Nor is the legislative history crystal clear on this point. The Conference Report is totally silent with respect to the permissible producers of exempt newscasts. And, although the Report does indicate an understanding by the 1959 Congress that control of exempt news interview programming would lie with either Commission licensees or networks, given that these two entities were the only serious players in the production game at the time the exemptions were drafted, it seems quite reasonable to read the Report as merely expressing a general intent of Congress to ensure that candidates themselves would not control the content or format of exempt programming.

Furthermore, TRAC is simply wrong to assert that the FCC would be unable to enforce its equal time regulations if independent parties were allowed to produce exempt news programming. In the first place, a show that succumbs to candidate manipulation would lose its exempt status as a "bona fide" news interview or newscast, making it much more difficult for the independent producer to market the show to broadcasters. *See Independent Producers Decision*, 7 F.C.C.R. at 4685. In addition, the broadcasters who actually air these programs *are* subject to the FCC's jurisdiction and remain responsible for either refusing to broadcast any candidate appearance that exceeds the boundaries of "bona fide" news programming or providing equal time to the candidate's opponents. Although TRAC does not believe that these regulatory checks are sufficient to carry out Congress's purposes in enacting the equal time provisions, the FCC, which is charged with administering the Communications Act, has determined that its ruling will further congressional goals and we see no reason to second-guess the Commission's judgment.

Nor is the Commission's decision rendered arbitrary by the fact that the Commission had previously held that only news inter-

views produced by licensees and networks could qualify for the "bona fide news interview" exemption. We have long recognized that "[a]n agency's view of what is in the public interest may change, either with or without a change in circumstances." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). When that happens, we require only that the "agency changing its course ... supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Id.* As discussed previously, the Commission in this case acknowledged that its decision rested on a new interpretation of the "bona fide news interview" exemption of section 315, but went on to explain how its decision comported with the language, legislative history, and purpose of the statute. This explanation was sufficient to satisfy our standards of reasoned agency decision making.

## III. CONCLUSION

The Commission's order holding that the news reporting segments of *The McLaughlin Group* are "bona fide newscasts" exempt from the equal time provisions of the Communications Act was based on a reasonable interpretation of the Act to which we defer. We likewise defer to the Commission's reasonable decision that the "bona fide news interview" and "bona fide newscast" exemptions to section 315 can extend to independently produced programming. We therefore deny the petitions for review.

*So ordered.*